**UNITED STATES COURT OF APPEALS**  April 12, 2018

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

EDGAR LEOPOLDO
GARCIA-MARTINEZ,

Defendant - Appellant.

No. 15-1432
(D. Colo.)
(D.C. No. 1:13-CR-00302-CMA-2)

**ORDER AND JUDGMENT**[*]

Before **HOLMES**, **KELLY**, and **MORITZ**, Circuit Judges.

Following a three-day trial, a federal jury convicted Defendant-Appellant

Edgar Leopoldo Garcia-Martinez ("Garcia-Martinez") of conspiracy to possess

and possession with the intent to distribute over a kilogram of heroin and 500

---

[*]    After examining the briefs and appellate record, this panel has
determined unanimously to honor the parties' request for a decision on the briefs
without oral argument.  *See* FED. R. APP. P. 34(f); 10TH CIR. R. 34.1(G).  The case
is therefore submitted without oral argument.  This order and judgment is not
binding precedent, except under the doctrines of law of the case, res judicata, and
collateral estoppel.  It may be cited, however, for its persuasive value consistent
with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

grams of methamphetamine, and the district court sentenced him to 121 months' imprisonment. Garcia-Martinez challenges his conviction, arguing (1) that the government violated *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972), by failing to disclose certain impeachment information concerning two confidential informants,[1] and (2) that the district court erred by permitting an expert witness to offer an opinion on Garcia-Martinez's "mental state," in contravention of Federal Rule of Evidence 704(b).

Exercising jurisdiction under 28 U.S.C. § 1291, we **affirm** the district court's judgment.

## I[2]

This drug-trafficking case arises from a confidential sting operation involving the Drug Enforcement Administration ("DEA") and two confidential informants, Roberto and Juan (together, the "CIs").

## A

The undercover operation began in July 2013, when the DEA received information that Javier Garcia ("Garcia")—a co-defendant in the underlying

---

[1]    As explicated *infra*, the disclosure obligations that the Supreme Court established in *Giglio* with respect to impeachment information fall under *Brady*'s general rubric. For shorthand purposes only, this order and judgment frequently refers only to the name "*Brady*" when discussing materials that the government is constitutionally obliged to disclose; such references should be understood to include the impeachment materials that the Supreme Court addressed in *Giglio*.

[2]    We include as background only those limited aspects of the factual and procedural history that relate to the issues we address.

2

criminal case—claimed an ability to deliver "pound" and "multiple ounce" quantities of methamphetamine and heroin from Oregon to Denver. R., Vol. III, at 277 (Trial Tr., dated July 20, 2015). Roberto told the DEA that Garcia drives a black BMW convertible and gave the agency a phone number for him.

Pretending to be a drug buyer, Roberto met Garcia in Oregon on July 12, 2013, and arranged for Garcia to deliver drugs to Colorado. During these negotiations, Roberto recognized Garcia-Martinez sitting "[m]aybe 10[ or] 15 feet" away. *Id.* at 641 (Trial Tr., dated July 22, 2015). On the day of the Colorado delivery, the DEA tracked Garcia's phone and car to a Comfort Inn in Wheat Ridge, Colorado. At that time, DEA Special Agent Cronin ("Agent Cronin") identified two vehicles in the Comfort Inn parking lot—a "black BMW convertible" and a "red Chevy Cobalt"—with out-of-state plates, both registered to Garcia. *Id.* at 282. In the meantime, Roberto met Garcia at a nearby Taco Bell to discuss the logistics of the drug transaction. During these discussions, Roberto again recognized Garcia-Martinez sitting "maybe 12 or 14 feet" from their table. *Id.* at 644.

After the meeting, Garcia and Garcia-Martinez picked up the vehicles from the Comfort Inn, and returned to the Taco Bell (with Garcia driving the BMW and Garcia-Martinez driving the Cobalt). From there, Roberto led Garcia and Garcia-Martinez to a DEA-controlled warehouse, where the drug transaction was supposed to be consummated with Juan, the other confidential informant. Once

3

they arrived inside the warehouse, a video captured Garcia-Martinez opening the hood of the Cobalt, while Garcia opened the trunk. After Garcia and Garcia-Martinez revealed the drugs to Roberto and Juan, DEA agents arrested Garcia and Garcia-Martinez.

Following the arrest, DEA agents discovered approximately two pounds of heroin and seventeen pounds of methamphetamine "in the front end of the [Cobalt], specifically behind the headlights, the front headlight units." *Id.* at 305. Subsequent forensic analysis revealed that Garcia-Martinez's fingerprints were on the drugs' "internal packaging." *Id.* at 361 (Trial Tr., dated July 21, 2015); *see id.* at 618 (answering Garcia-Martinez's name, when the prosecutor asked, "So, in your expert opinion, whose fingerprints were located on four separate wrappings, which would be the two separate plastic wraps and the two separate Ziplock bags?").

**B**

On July 22, 2013, a federal grand jury in the District of Colorado returned an indictment charging Garcia-Martinez with conspiracy to distribute heroin and methamphetamine and possession with intent to distribute heroin and methamphetamine. In anticipation of trial, on August 29, 2014, Garcia-Martinez moved for the "timely" disclosure of *Brady* and *Giglio* materials, *id.*, Vol. I, at 87–98 (Def.'s Unopposed Mot. for Timely Disc. of *Giglio* Materials, dated Aug. 29, 2014), which the district court granted on September 3, 2014.

4

Shortly thereafter, however, the government opposed certain aspects of Garcia-Martinez's discovery requests and the district court directed the parties to "simultaneous[ly] re-brief" issues concerning the scope of the government's disclosure of *Brady* and *Giglio* materials. *Id.*, Vol. III, at 50 (Tr. Mots. Hr'g, dated Dec. 22, 2014). In its supplemental submission, the government explained that its summary disclosures—primarily in the form of two letters—to Garcia-Martinez included the following information regarding the two CIs:

| Juan | Roberto |
|---|---|
| 1. His full name; <br> 2. The amount he was paid for participation in this case ($4,000); <br> 3. The amount he had been paid by the DEA, in total, for all of his work in this case and in prior cases ($453,431); <br> 4. That the DEA did not provide him with any further consideration or benefits besides these payments; <br> 5. His criminal history; <br> 6. A redacted DEA Form 473 ("Confidential Source Agreement") and a blank DEA Form 473; <br> 7. Impeachment information (specifically, that the DEA is unaware of any instances where he testified falsely or dishonestly); <br> 8. That the DEA is not aware of any history of mental illness or | 1. His full name; <br> 2. The amount he was paid for participation in this case ($9,000 by the DEA and an additional $1,000 by the Rocky Mountain High Intensity Drug Trafficking Area ("HIDTA") program); <br> 3. The amount he has been paid by the DEA, in total, for all of his work as a confidential informant, including his work in this case and prior cases ($21,481); <br> 4. That the DEA did not provide him with any further consideration or benefits besides these payments; <br> 5. His criminal history (specifically noting that he had a history of marijuana use); <br> 6. A redacted DEA Form 473 ("Confidential Source Agreement"); |

5

| | |
|---|---|
| substance abuse;<br>9. That he did not receive any immigration benefits; and<br>10. That he had never worked for another law enforcement agency. | 7. Impeachment information regarding his traits for honesty and/or issues with his integrity (specifically including four instances when federal agencies questioned his honesty, which eventually led to his termination as a CI by the DEA);<br>8. That he received no immigration benefits and that the DEA believed he had entered the country "in a status described as Conventions Against Torture"; and<br>9. That the DEA was aware of his use of marijuana, but not of any history of mental illness. |

*See id.*, Vol. I, at 173–76 (U.S.'s Mot. Concerning Outstanding Issues, dated Jan. 16, 2015).[3] Given the avowed breadth of these disclosures, the government labeled any additional information that Garcia-Martinez requested cumulative or immaterial.

---

[3] As to Roberto's prior instances of misconduct and dishonesty, the summary specifically revealed: (1) Roberto "was involved in illegal activity in December of 2013 and lied to DEA agents," (2) "another allegation in 2011 of dishonesty in which [Roberto was] reported to be manipulative and not to be trusted," (3) "[i]n December of 2010 [Roberto] met with targets of an investigation without notifying the agents, in violation of his agreement," and (4) "[i]n 2009 an ICE [i.e., Immigration and Customs Enforcement] agent reported [Roberto] was unreliable and had integrity issues." R., Vol. I, at 233 (Def.'s Mot. for Recons. of Ct.'s Ruling Regarding Disclosure of Information of Confidential Informants, dated Mar. 3, 2015).

Garcia-Martinez challenged the adequacy and completeness of the government's disclosures on essentially two grounds: *first*, he claimed that the summary information was too sparse to enable his counsel to impeach the CIs *or* to conduct an impeachment-related investigation into their backgrounds; and *second*, Garcia-Martinez speculated, based on the contents of the summary disclosures, that the DEA *must* have additional, but undisclosed, *Brady* and *Giglio* materials. Accordingly, defense counsel demanded production of additional information, including the CIs' unredacted cooperation agreements, the CIs' tax returns, records regarding the DEA's payments to the CIs, and information regarding the informants' history of criminal activity, especially outside of Colorado. *See id.* at 160–67 (Def.'s Mem. Regarding Disclosure & Disc. of Confidential Informants & *Giglio* Materials, dated Jan. 16, 2015).

Crediting the veracity of the government's representations, the district court initially denied these requests as essentially cumulative. *See id.* at 206 (Order Den. Def.'s Mot. for Disclosure & Disc. of Confidential Informants & *Giglio* Materials, dated Feb. 11, 2015). More specifically, the court stated that "a close comparison between what Defendant has already received from the Government and what he currently requests reveals that much of what he requests is cumulative and would reveal no substantial additional information." *Id.* at 211. Notably, the court underscored the government's representations that "the DEA did not provide either informant [i.e., Roberto or Juan] with any further

7

consideration or benefits besides the monetary payments," and, more specifically, that the DEA did not provide either CI with immigration benefits. *Id.* at 212–13.

The district court, however, granted Garcia-Martinez's motion to reconsider its discovery ruling. As a result, the court conducted an *in camera* review of the DEA's files with respect to the CIs. The district court confirmed that the government had properly honored its disclosure obligations with respect to Juan; as to him, no further disclosures were required. However, as to Roberto, the court found (without significant discussion) that the disclosures the government had already made should be supplemented in a limited fashion with certain information that generally (1) clarified the precise amount of money that Roberto had been paid by the DEA and the HIDTA, and (2) elaborated on the disclosed impeachment information that attacked Roberto's truthfulness and integrity.

### C

Following these pretrial rulings, the case proceeded to trial, during which the government introduced the testimony of Juan (one of the government's two confidential informants), Agent Cronin, and various task force officers and forensic specialists, while Garcia-Martinez relied only on the testimony of Roberto (the government's other confidential informant). Agent Cronin testified, in particular, concerning his factual familiarity with the underlying investigation into Garcia-Martinez's drug activities, and—as an expert—regarding "drug transportation and trafficking of illegal substances" and on the investigative use

8

of "confidential sources." *Id.*, Vol. III, at 266–67. As part of that expert testimony, Agent Cronin discussed the "methods . . . used in the transportation and trafficking of drugs"—including secreting drugs in "batteries, . . . bumpers, [and] the back door panels of private vehicles"—and explained that in certain instances "people can transport drugs without their knowledge." *Id.* at 268–69.

Specifically, Agent Cronin explained that some transporters have "knowledge of the drugs being secreted in the vehicle" but "most often . . . no contact with the true controllers of the drugs." *Id.* at 269. Others "are not told what they're carrying"; that is, they have "no exact knowledge" of "the criminal activity of transporting drugs," but are simply paid "to drive a vehicle [with unknown contents] from one point to another." *Id.* at 269, 354. According to Agent Cronin, law enforcement refers to the latter group as "unwitting participants." *Id.* at 354.

Applying that knowledge distinction, Agent Cronin then testified, as an expert, that Garcia-Martinez's involvement failed to fall within "the definition of an unwitting person" because surveillance captured Garcia-Martinez accompanying Garcia "at the Taco Bell," "subsequently driving the red Cobalt . . . to the warehouse," and then "opening up the hood of the vehicle and being present at the" intended location of the drug transaction. *Id.* at 356. Defense counsel objected, arguing that Agent Cronin's expert testimony improperly

9

"defin[ed] . . . the elements of the offense" and "crosse[d] into the purview of the jury's decision." *Id.* at 356. The district court overruled the objection.

Agent Cronin later added, without objection, that a fingerprint analysis identified Garcia-Martinez's fingerprints on the drugs' "internal packaging"—a fact which, in Agent Cronin's view, proved inconsistent with an "unwitting individual" because "it would be obvious that [the individual] actually handled the dope." *Id.* at 361. A forensic expert confirmed the presence of Garcia-Martinez's fingerprints on the packaging.

The CIs then testified to different recollections concerning Garcia-Martinez's involvement in the drug transaction. Specifically, Juan testified that Garcia-Martinez "lift[ed] the hood of the red Cobalt," and then "[brought the drugs] over to [him]." *Id.* at 552–53. Roberto testified, by contrast, that he recalled Garcia-Martinez's presence at the negotiations and the ultimate drug transaction, but denied observing Garcia-Martinez "tak[ing] anything out from under the hood" or "hand[ing] anything" to Juan. *Id.* at 652–53.

Following the presentation of evidence, the jury convicted Garcia-Martinez on all counts, and this appeal followed.

## II

On appeal, Garcia-Martinez raises two separate challenges: *first*, he claims that the government suppressed material impeachment information in violation of *Brady* and *Giglio*; and *second*, he submits that the district court improperly

10

admitted certain aspects of Agent Cronin's expert testimony. We review each issue in turn.

## A

In a nutshell, Garcia-Martinez argues that "it is clear the United States suppressed the necessary *Brady and Giglio* evidence contrary to the due process and confrontation clauses of the United States Constitution by providing a simple summary letter that could not be effectively used in court." Aplt.'s Opening Br. at 22–23. He asks us to conduct an *in camera* review of "the actual files of the DEA" to confirm that such suppression has taken place and, based on that suppression determination, to reverse the district court's judgment and remand for a new trial. *Id.* at 23. We reject Garcia-Martinez's *Brady*/*Giglio* challenge for three distinct and independent reasons. First, because he relies on speculation and conjecture, Garcia-Martinez has not made an adequate showing to warrant our engaging in an *in camera* review of the DEA documents. Second, having taken the step in an abundance of caution of engaging in a properly circumscribed *in camera* review of the DEA documents—*viz.*, a review focused on the documents pertaining to the *government's* CI witness, Juan—we find no merit in Garcia-Martinez's argument that the DEA has suppressed material impeachment information. And, third, we conclude as a matter of law that even if the government had suppressed impeachment information with respect to CIs Roberto and Juan, such suppression could not have prejudiced Garcia-Martinez because

11

the government introduced ample evidence of Garcia-Martinez's guilt quite apart from the CIs' testimony. In other words, even if Garcia-Martinez's access to, and use of, suppressed impeachment information had convinced the jury to disregard entirely the testimony of CIs Roberto and Juan, there is no reasonable probability that the outcome of the trial would have been different. That is, any suppressed impeachment information could not have been material as a matter of law under the facts and circumstances of this case.

Before addressing these three grounds for upholding the district court's *Brady* ruling, we begin by discussing the basic principles that the Supreme Court established in *Brady* and its progeny. Specifically, in *Brady*, the Court concluded that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. For *Brady* purposes, exculpatory evidence includes evidence usable only for impeachment purposes. *See United States v. Tracy Smith*, 534 F.3d 1211, 1222 (10th Cir. 2008) ("Impeachment evidence is exculpatory for *Brady* purposes."). Further, the prosecution's *Brady* obligation carries an underlying "duty to learn of any favorable evidence known to the others acting on the government's behalf in the case." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995); *see William Smith v. Sec'y of N.M. Dep't of Corr.*, 50 F.3d 801, 824 (10th Cir. 1995) ("[T]he 'prosecution' for *Brady* purposes encompasses not only the individual

12

prosecutor handling the case, but also extends to the prosecutor's entire office, as well as law enforcement personnel and other arms of the state involved in investigative aspects of a particular criminal venture." (citation and footnote omitted)); *accord McCormick v. Parker*, 821 F.3d 1240, 1246–47 (10th Cir. 2016).

In order to establish a *Brady* violation, "the defendant must prove by a preponderance of the evidence [that]: (1) the government suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material." *United States v. Garcia*, 793 F.3d 1194, 1205 (10th Cir. 2015) (quoting *United States v. Reese*, 745 F.3d 1075, 1083 (10th Cir. 2014)), *cert. denied*, 136 S. Ct. 860 (2016). "Evidence is 'material' under *Brady* 'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *United States v. Mendez*, 514 F.3d 1035, 1046 (10th Cir. 2008) (quoting *United States v. Robinson*, 39 F.3d 1115, 1118 (10th Cir. 1994)). A "reasonable probability" means "a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Robinson*, 39 F.3d at 1118).

It is important to underscore that "[t]here is no general constitutional right to discovery in a criminal case, and *Brady* did not create one." *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977). In this regard, the Supreme Court explained:

> The *Brady* rule is based on the requirement of due process. Its purpose is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a

13

> miscarriage of justice does not occur. Thus, the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial.

*United States v. Bagley*, 473 U.S. 667, 675 (1985) (footnotes omitted). Simply because information may aid a defendant in the preparation of his or her case does not mean that the prosecution is obliged under *Brady* to disclose it. *See, e.g.*, *United States v. Agurs*, 427 U.S. 97, 109–10 (1976) ("Whether or not procedural rules authorizing such broad discovery might be desirable, the Constitution surely does not demand that much. . . . The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense."); *William Smith*, 50 F.3d at 823 ("The Constitution, as interpreted in *Brady*, does not require the prosecution to divulge every possible shred of evidence that could conceivably benefit the defendant."); *United States v. Smaldone*, 544 F.2d 456, 462 (10th Cir. 1976) ("[Defendant's] argument [under, *inter alia*, *Brady*] is, for all practical purposes, simply that the Government prosecutor has an obligation to produce evidence which may or might in any manner aid in his defense. The contention is without merit. It fails to recognize the basics of our adversary system."). In order to prevail on his or her *Brady* claim, a defendant must marshal arguments that are more than "merely speculative" that demonstrate by a preponderance of the evidence that the three *Brady* criteria are satisfied—*viz.*, the

14

government suppressed the information and it "constituted material, exculpatory evidence." *Sandoval v. Ulibarri*, 548 F.3d 902, 915 (10th Cir. 2008); *see Garcia*, 793 F.3d at 1205.

## 1

In his appellate briefing, Garcia-Martinez relies on speculation and conjecture in requesting that we conduct an *in camera* review of the DEA's CI files. That is not enough. As a general matter, *Brady*'s "holding places no investigative obligation on *courts*, but rather only mandates that *the prosecution* must turn over all potentially exculpatory evidence in its possession." *United States v. Dabney*, 498 F.3d 455, 459 (7th Cir. 2007); *see United States v. Bland*, 517 F.3d 930, 935 (7th Cir. 2008) ("The district court is under no general independent duty to review government files for potential *Brady* material."). Moreover, *in camera* review is frequently time-consuming and may tax limited judicial resources; therefore, it is not a remedy to be unstintedly granted. *Cf.* 6 Wayne R. LaFave et al., CRIMINAL PROCEDURE § 24.3(b), at 447 (4th ed. 2015) (noting that "[c]ourts tend to be reluctant to undertake pretrial review of *Brady* requests," *inter alia*, because such "in camera inspection can 'impose an intolerable burden on already taxed judicial resources'" (quoting Bennett L. Gershman, PROSECUTORIAL MISCONDUCT § 5:17 (2d ed. 2015))).

To justify a court undertaking an *in camera* review for *Brady* material, at the very least, a defendant must make a "plausible showing" that the government

15

files at issue contain "material" exculpatory or impeachment information. *United States v. Williams*, 576 F.3d 1149, 1163 (10th Cir. 2009); *accord Riley v. Taylor*, 277 F.3d 261, 301 (3d Cir. 2001) (en banc) ("A defendant seeking an in camera inspection to determine whether files contain *Brady* material must at least make a 'plausible showing' that the inspection will reveal material evidence." (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 58 n.15 (1987))); *see Godlock v. Fatkin*, 84 F. App'x 24, 29 (10th Cir. 2003) (unpublished) (noting that "we are not obligated to remand for an *in camera* review of the medical report to determine whether it contains *Brady* material" because the habeas petitioner's "conclusory allegations and speculation about what the medical report might contain fail to meet the *Brady* standard"); *see also United States v. Prochilo*, 629 F.3d 264, 268–69 (1st Cir. 2011) (noting that to merit *in camera* review of disputed *Brady* materials, the defendant must "articulate with some specificity what evidence he hopes to find in the requested materials, why he thinks the materials contain this evidence, and finally, why this evidence would be both favorable to him and material," and, in this regard, his "showing cannot consist of mere speculation"); *Bland*, 517 F.3d at 935 (noting that "mere speculation that a government file might contain *Brady* material is not sufficient" to justify *in camera* review); *cf. United States v. Moralez*, 908 F.2d 565, 567–69 (10th Cir. 1990) (where the only contested matter was the identity of the informant still insisting that "the defendant must present more than mere speculation about the possible usefulness of an informant's

testimony," and concluding that "[u]nder the circumstances [there], an *in camera* hearing will best accommodate the competing governmental and individual interests in this case," where the defendant "clearly stated how the informant's testimony was essential to [his] defense").

Garcia-Martinez's request that we conduct an *in camera* review does not satisfy the above-noted plausibility standard; instead, it is based on sheer speculation and conjecture. For example, Garcia-Martinez asserts that there is a "likelihood"—despite the government's contrary representations in its disclosure materials—that the government gave CI Juan "immigration benefits"—*viz.*, there is a likelihood that the government suppressed information regarding such immigration benefits and that this information is contained in the DEA's CI files. *See* Aplt.'s Opening Br. at 19.

However, this assertion is entirely conclusory and Garcia-Martinez offers nothing more than speculation in an effort to substantiate it. He simply reasons, without any evidentiary support that, though it is "possible" CI Juan (a Mexican national) became an American citizen prior to his DEA-informant work, as Juan testified at trial, Garcia-Martinez had no "immigration information" "to counter" Juan's testimony on this point. *Id.* at 19–20. Presumably, he speaks of information that would tend to establish that the DEA—or some federal immigration agency at the DEA's behest—gave Juan immigration benefits that helped him to become a citizen, or even "extended [immigration benefits] to [his]

17

family," in exchange for Juan's CI work. *Id.* However, these speculative arguments do nothing to plausibly indicate that such immigration-benefit information exists in the DEA's CI files.[4]

Garcia-Martinez is correct in contending that the prosecution also may be held accountable under *Brady* for material exculpatory information that is in the files of "governmental agencies closely aligned" with it. *See id.* at 20 (quoting *United States v. Harry*, 927 F. Supp. 2d 1185, 1209 (D.N.M. 2013), *aff'd*, 816 F.3d 1268 (10th Cir. 2016)); *see, e.g.*, *Kyles*, 514 U.S. at 437 (discussing the prosecution's *Brady* "duty to learn of any favorable evidence known to the others acting on the government's behalf in the case"). However, he does not even attempt to demonstrate that any federal immigration agency was closely aligned with the prosecution in this case— *viz.*, part of "the prosecution team." *McCormick*, 821 F.3d at 1242 (imputing knowledge of material impeachment information regarding a sexual assault nurse examiner, who was not an employee of a criminal law enforcement agency, to the prosecutor, because "under the circumstances of this case" the nurse "was a member of the prosecution team"); *accord William Smith*, 50 F.3d at 824. Perhaps more to the point, Garcia-Martinez does not tell us how the requested *in camera* review would shed light on

---

[4]     Garcia-Martinez offers similar, non-specific speculation regarding the "immigration benefits" that were allegedly "promised" and then "withdrawn" from CI Roberto. Aplt.'s Opening Br. at 20.

18

any such alignment or lead to the discovery of material exculpatory information. In sum, Garcia-Martinez's arguments regarding possibly undisclosed immigration benefits do not satisfy the plausibility standard.

Similarly, Garcia-Martinez observes that, because it is undisputed that CI Juan worked for the DEA for "over [] twenty years," the DEA must have "many prior statements" of Juan "memorialized through de-briefings," and criminal-history information regarding Juan that is more specific and detailed than the information that the government already had provided. Aplt.'s Opening Br. at 18. Garcia-Martinez argues that such criminal-history information "would have yielded some fertile ground for investigation." *Id.* However, Garcia-Martinez does not offer a plausible explanation for why he believes Juan's allegedly numerous prior statements and any more detailed criminal-history information about him may contain material impeachment information within the meaning of *Brady* and its progeny.[5]

---

[5] Notably, Garcia-Martinez has not alleged on appeal that the government violated its distinct and independent duty under the Jenks Act to produce statements of CI Juan or any other government witness. *See* 18 U.S.C. § 3500 ("After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement . . . of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified."); *United States v. Carter*, 613 F.2d 256, 261 (10th Cir. 1979) ("[T]he [Jencks] Act assures defendants their Sixth Amendment rights to confront their accusers by compelling the Government to produce 'statements' that may be useful for impeachment of Government witnesses.").

Garcia-Martinez also makes much of the fact that, during his trial testimony, CI Juan indicated that he had not paid taxes on the money that the DEA had paid to him for informant work and had collected disability payments from the federal government despite working during this period for the DEA. Garcia-Martinez states that Juan's testimony in this regard indicates that he lied to the U.S. Internal Revenue Service ("IRS") and the U.S. Social Security Administration ("SSA") during his DEA service and, yet, the government in its summary disclosure indicated that the "DEA was not aware of any instances of false testimony or falsity" involving Juan. *Id.* at 19. These events have led Garcia-Martinez to wonder: "If the DEA was not disclosing these crimes, what else . . . were [they] complicit in covering up to protect their source?" *Id.* Garcia-Martinez leaves the question hanging, however; he makes no effort to offer a plausible theory of what information the DEA might be covering up and how it might qualify as favorable and material within the meaning of *Brady*. In short, he has not carried his burden of establishing an adequate basis for *in camera* review.

To be sure, we recognize that, at bottom, Garcia-Martinez's argument is that, *if* the DEA knew of allegedly material impeachment information regarding CI Juan with respect to these tax and disability matters and did not disclose the information, it is reasonable to believe that the DEA may have other impeachment information in its CI file regarding Juan that it has not disclosed. However, even

20

assuming *arguendo* that there is some cogency to the logic of this argument, it depends in substantial part on a central proposition—that the DEA actually knew of CI Juan's apparently false statements to the IRS and SSA and failed to disclose this information. Yet, Garcia-Martinez has provided no information that tends to establish this point. (Nor has Garcia-Martinez argued that either the IRS or the SSA was part of the prosecution team of the criminal investigation leading to his indictment such that the prosecution might be held responsible for inquiring of either agency, to avoid a possible *Brady* violation, whether it possessed impeachment information regarding CI Juan.) Accordingly, Garcia-Martinez's arguments related to CI Juan's purported false statements to the IRS and SSA do not provide a plausible theory justifying our *in camera* review.

Further, Garcia-Martinez repeatedly complains that the summary disclosure (primarily in the form of two letters) that the prosecution provided to him in carrying out its *Brady* duty was inadequate because "the summary document was hearsay and could not be used to impeach or discredit the witnesses." *Id.* at 21. Garcia-Martinez underscores that he "asked for the original documents and raw data concerning each informant's activities [] because the summaries provided were largely ineffective to impeach the Government's informant witnesses." *Id.*

At the outset, we note that Garcia-Martinez's suggestion that hearsay rules barred his use at trial of the summary disclosures to impeach the government's witnesses is misguided; when used solely for impeachment purposes, the

21

disclosures would not be hearsay at all. *See Foster v. Ward*, 182 F.3d 1177, 1188 (10th Cir. 1999) ("Evidence presented to impeach the witness rather than establish the truth of the matter asserted is not hearsay."); *cf.* FED. R. EVID. 801(c) (noting that hearsay "means" evidence that is offered "to prove the truth of the matter asserted in the statement").

Moreover, Garcia-Martinez has not supplied any plausible, non-speculative reason to believe that the "original documents and raw data" in the DEA's CI files contain material impeachment information (or something likely to lead to such impeachment information) that would be additive of, or go beyond, the impeachment information that the government had already provided to him in the summary disclosures. Furthermore, Garcia-Martinez has not cited any authority, and we are not aware of any, that entitled him to receive *Brady* material in the form of originals and raw data. In other words, if the summary disclosures satisfied the prosecution's *Brady* obligations in this case—*viz.*, communicated to Garcia-Martinez the necessary material exculpatory (i.e., impeachment) information—Garcia-Martinez has not demonstrated that he was legally entitled to independently receive originals and raw data containing, at least in substance, the same information. *Cf. United States v. Greatwalker*, 356 F.3d 908, 911–12 (8th Cir. 2004) (per curiam) (rejecting for a lack of prejudice the defendant's *Brady* claim based on the government's failure "to provide agents' handwritten notes of witness interviews" where the defendant "was provided with typed

22

accounts of the interviews" and did "not indicate how the handwritten notes were *additionally* exculpatory" (emphasis added)).

True, Garcia-Martinez has "complained that the summary letters did not contain any significant identifying information" and, consequently, he was rendered "unable to investigate the informant's activities that may bear upon their credibility." Aplt.'s Opening Br. at 21. However, as a general matter, the government was not obliged under *Brady* to provide Garcia-Martinez with information that would assist him in gathering impeachment material to bolster his case. *See United States v. Ashley*, 274 F. App'x 693, 697 (10th Cir. 2008) (unpublished) ("[T]he Due Process Clause does not require the government to disclose before trial the names of its witnesses, just so the defense can have sufficient time to investigate their backgrounds for impeachment information."); *cf. United States v. Nevels*, 490 F.3d 800, 803 (10th Cir. 2007) ("The Supreme Court has established that no *constitutional* right to pretrial discovery of witnesses exists in non-capital cases."). The germane question is whether the government was actually in possession of material information bearing on the CIs' credibility that it had *not* already disclosed. Garcia-Martinez responds to this question with only speculation and conjecture. And that is not good enough to warrant our *in camera* review.

In sum, our conclusion that Garcia-Martinez has not made a "plausible showing" that the DEA's CI files contain "material" exculpatory (i.e.,

23

impeachment) information warrants our rejection of his request for *in camera* review. *Williams*, 576 F.3d at 1163. Admittedly, Garcia-Martinez is in "a tough position" in making this plausibility showing without having an idea of what materials are in the DEA's CI files. Aplt.'s Reply Br. at 6. But he must nevertheless offer us more than speculation and conjecture. *Cf. United States v. Phillips*, 854 F.2d 273, 278 (7th Cir. 1988) ("[A] *Brady* request does not entitle a criminal defendant to embark upon an unwarranted fishing expedition through government files . . . ."). His failure to do so provides an independent basis for rejecting Garcia-Martinez's *Brady* claim because it asks us to find error in the district court's *in camera* review by conducting our own such review.

**2**

To ensure that we had the requisite materials to dispose of this appeal, we previously granted the government's unopposed motion to provide us with the DEA's CI files under seal and also set forth procedures that would control any *in camera* review of those materials. Under the reasoning of Part II.A.1, *supra*, Garcia-Martinez would have no entitlement to our *in camera* review of those materials and his *Brady* claim would consequently be rendered fatally infirm. However, even if we put aside that conclusion, we still must reject Garcia-Martinez's *Brady* claim. Specifically, we have conducted a careful, time-intensive review of the DEA's CI files, subject to a significant substantive restriction noted below. The volume of these materials is not insignificant. They

24

consist of papers organized in file folders; when the folders are stacked one on top of another, they reach a height of approximately one foot (i.e., twelve inches). Based on that *in camera* review, we conclude that the government did not suppress material impeachment information favorable to Garcia-Martinez. Accordingly, we also uphold the district court's *Brady* ruling on this ground.

As noted, our review of the DEA's CI files was circumscribed in one significant substantive respect. Specifically, though we ultimately examined each piece of paper in the DEA's CI files to avoid overlooking anything relevant to our inquiry, the focus of that inquiry was solely on whether the government suppressed material impeachment information with respect to *its* witness, CI Juan. Though CI Roberto helped to arrange the controlled buy of narcotics that resulted in Garcia-Martinez's prosecution, Roberto testified as a *defense* witness for Garcia-Martinez, not as a witness for the government. And this accounts for our narrowing of the aperture for our inquiry.

Garcia-Martinez has not cited any controlling precedent, and we are not aware of any, that would have obliged the government under *Brady* to disclose information that is exculpatory—in a purely impeachment sense—with respect to a *defense* witness.[6] *See United States v. Green*, 178 F.3d 1099, 1109 (10th Cir.

_____

[6] Quite apart from this point, we would decline to conduct an *in camera* review with respect to CI Roberto because Garcia-Martinez's stated reasons for seeking information regarding him fall outside of the ambit of the government's disclosure obligations under *Brady*. Garcia-Martinez's principal

(continued...)

25

[6](...continued)
contention is that "[t]he issue [he] was precluded from exploring under *Brady*" is whether the government really terminated Roberto's CI status and declined to call him as a witness because of his CI integrity issues and misconduct—as the government claimed—or because of "the substance of his testimony" that portrayed Garcia-Martinez as "not [being] involved to the degree necessary to establish the government's case."  Aplt.'s Reply Br. at 4.  However, it follows *a fortiori* from the proposition that "*Brady* did not create" a "general constitutional right to discovery in a criminal case," *Weatherford*, 429 U.S. at 559, that it did not establish a right to the disclosure of information simply because it may shed light on the prosecution's litigation strategy.  *See* LaFave, *supra*, § 24.3(b), at 432 (citing *Weatherford* and noting that "the due process duty to disclose extends only to evidence, not strategy").  Moreover, insofar as Garcia-Martinez suggests that the government's decision to terminate Roberto as a CI and not to call him as a trial witness signals that the DEA's files regarding him contain undisclosed information favorable to the defense, he engages in pure speculation and conjecture, and we decline to do likewise.  *See Ashley*, 274 F. App'x at 696 n.2 ("[W]e are unwilling to infer the existence of material impeachment evidence within the meaning of *Brady* and *Giglio* by engaging in a high degree of speculation about the government's litigation decision-making.  In particular, we will not speculate that at the time of the initial trial the government decided not to call the three individuals at issue as witnesses because their testimony was unfavorable to its case (and, thus, presumably favorable to the defense) . . . .").

Furthermore, Garcia-Martinez insists that he would have benefitted from the government disclosing information covering the period when the DEA had deemed CI Roberto reliable (i.e., the period before the DEA found CI Roberto's integrity and veracity unacceptably flawed); that positive information, says Garcia-Martinez, would have been "germane and material."  Aplt.'s Reply Br. at 4.  However, *Brady* does not oblige the government to furnish information to the defense simply because it is relevant and helpful.  *See Agurs*, 427 U.S. at 112 n.20 ("It has been argued that the standard should focus on the impact of the undisclosed evidence on the defendant's ability to prepare for trial, rather than the materiality of the evidence to the issue of guilt or innocence.  Such a standard would be unacceptable for determining the materiality of what has been generally recognized as '*Brady* material' . . . ." (citation omitted)); *Ashley*, 274 F. App'x at 697 ("[T]he Due Process Clause does not require the government to disclose before trial the names of its witnesses, just so the defense can have sufficient time to investigate their backgrounds for impeachment information."); *see also*

(continued...)

1999) (noting that "both the discovery order and *Giglio* apply only to impeachment information relating to a government witness," and that they were "inapplicable because the government did not ever call" the witness the defendant hoped to impeach); *Hatch v. Oklahoma*, 58 F.3d 1447, 1469 (10th Cir. 1995) ("In *Giglio*[], the Supreme Court held that the due process protection announced in *Brady* includes evidence that undermines the credibility of the *prosecution's* witnesses." (emphasis added) (citation omitted)), *overruled on other grounds by Daniels v. United States*, 254 F.3d 1180, 1188 n.1 (10th Cir. 2001) (en banc); *see also United States v. Kimley*, 60 F. App'x 369, 372 (3d Cir. 2003) (unpublished) ("[T]here is no requirement that the government must disclose to the defense that material which would allow the defendant to impeach his own witness."); *cf. In re Sealed Case No. 99-3096*, 185 F.3d 887, 893 (D.C. Cir. 1999) ("In the usual case there is a conceptual difference between the impeachment of a government witness and the impeachment of a defense witness.  Evidence that impeaches the former is almost invariably 'favorable' to the accused, because by making the government's case less credible it enhances the defendant's chances of acquittal.

---

[6](...continued)
*Wardius v. Oregon*, 412 U.S. 470, 474 (1973) (noting that "the Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded"); *accord Nevels*, 490 F.3d at 803. Therefore, in light of Garcia-Martinez's stated rationale for seeking material impeachment information regarding *his* witness, CI Roberto, the government was not obliged to disclose it under *Brady*, and we likewise have no need in our *in camera* review to determine whether the government suppressed such information.

27

Evidence that impeaches a defense witness, by contrast, is not generally favorable to the accused; by reducing the credibility of the defendant's own witness, such impeachment reduces the probability that he will obtain a not guilty verdict. It is ordinarily the prosecutor rather than defense counsel who wants to use the latter kind of evidence . . . .").

Indeed, in his opening brief, Garcia-Martinez recites this general proposition. Aplt.'s Opening Br. at 15 (noting that evidence is material within the meaning of *Brady*/*Giglio* "when it is impeachment of a critical and essential witness *for the government*" (emphasis added)). And, when the government affirmatively argued in its answer brief that it had no obligation to disclose impeachment information regarding defense witnesses, Garcia-Martinez did not directly respond in its reply brief; he simply faulted the government for adopting "a very literal interpretation of *Brady*." Aplt.'s Reply Br. at 3.[7] Consequently, our *in camera* inquiry was properly focused on whether the government suppressed material impeachment information with respect to *its* informant

---

[7] For inscrutable reasons, Garcia-Martinez attempts to bolster his (indirect) response to the government's position regarding the absence of a duty to disclose impeachment information with respect to *defense* witnesses by quoting the standard of Federal Rule of Criminal Procedure 16(a)(1)(A), and noting that "the standard is not actually called witnesses, but intended witness." Aplt.'s Reply Br. at 3 (emphasis omitted). This rule, however, is patently inapposite for a number of reasons, most salient among them being that it relates to the disclosure of relevant statements made by the *defendant*, if the government intends to use the statements at trial; Garcia-Martinez has not suggested that any statements made by him were used at trial but not disclosed upon request.

28

witness, Juan. And, after a careful and time-intensive review of the DEA's CI files, we conclude that it did not.

**3**

We now turn to our third independent ground for upholding the district court's *Brady* determination. Specifically, even though we have undertaken *supra* a careful *in camera* review of the DEA's CI files to determine whether the government suppressed material impeachment information, we need not rely on the results of that review to uphold the district court's rejection of Garcia-Martinez's *Brady* challenge. That is because even assuming *arguendo* that the government suppressed some favorable impeachment information with respect to the CIs, we would be hard-pressed to conclude in light of the government's ample evidence of Garcia-Martinez's guilt that such information was material. Put another way, given the strength of the government's case against Garcia-Martinez, there is not a reasonable probability that our confidence in the soundness of the outcome would be undermined, even if any suppressed impeachment evidence caused the jury to disregard *entirely* the CIs' testimony—especially that of the government's witness, Juan. *See United States v. Buchanan*, 891 F.2d 1436, 1443 (10th Cir. 1989) ("[W]here a witness' credibility is not material to the question of guilt, failure to disclose impeachment evidence does not violate *Brady*."); *cf. United States v. Gonzalez-Montoya*, 161 F.3d 643, 649 (10th Cir. 1998) (noting that an alleged coconspirator, turned

29

cooperating witness, was "a material witness whose credibility, or lack thereof, played a critical role in the determination of [the defendant's] guilt or innocence").

"The potential impact of the undisclosed evidence should be weighed in light of the whole record. What might be considered insignificant evidence in a strong case might suffice to disturb an already questionable verdict." *Robinson*, 39 F.3d at 1119. We recognize that the materiality inquiry asks more than whether a rational jury would have found the evidence sufficient to support a guilty verdict. As the Court stated in *Kyles*, "the question is not whether the State would have had a case to go to the jury if it had disclosed the favorable evidence, but whether we can be confident that the jury's verdict would have been the same." 514 U.S. at 453. Nevertheless, logical reasoning strongly indicates that when the government has a "strong case" in support of a guilty verdict—quite apart from the undisclosed evidence—it becomes less likely that this evidence could engender a reasonable probability of a different outcome—*viz.*, less likely that this evidence could be deemed material under *Brady*. *Robinson*, 39 F.3d at 1119; *see Hammond v. Hall*, 586 F.3d 1289, 1319 (11th Cir. 2009) (noting that "the stronger the evidence of guilt to begin with, the more favorable to the defense the undisclosed evidence will have to be to create a reasonable probability that a jury would have acquitted had the evidence been disclosed" (quoting *Derrick Smith v. Sec'y, Dep't of Corr.*, 572 F.3d 1327, 1347 (11th Cir.

30

2009))). In this regard, we underscore that Garcia-Martinez only contends that the government had a constitutional obligation to disclose the information because it could have significantly facilitated the impeachment of the CIs—either directly or indirectly. There is no contention here that the evidence was otherwise exculpatory. *Cf. Robinson*, 39 F.3d at 1118–19 (upholding the district court's decision to grant a new trial under *Brady* where the government failed to disclose eyewitness testimony regarding the description of the person who picked up the narcotics that "tend[ed] to support the inference that one of the two main witnesses against [the defendant] may in fact have committed the [drug] crime of which [the defendant] was convicted").

Yet, even if Garcia-Martinez could have effectively nullified through cross-examination the CIs' testimony—armed with the favorable impeachment information that the government supposedly suppressed—there is not a reasonable probability that the jury would have reached a different verdict—*viz.*, the information was not material. Specifically, the government caught Garcia-Martinez, along with his alleged co-conspirator Garcia, on camera, in a non-public setting of a warehouse, trying to sell large quantities of narcotics to the CIs, and Garcia-Martinez's fingerprints were found on the internal packing of the drugs. Contrary to Garcia-Martinez's suggestion, this is not a situation where he was merely present at the scene of a drug deal, and his guilt depended on CI testimony regarding his participation in the drug conspiracy. Morever, even

31

Garcia-Martinez's own authority makes clear that, though "[m]ere presence at the scene of the crime does not, by itself, prove involvement," it is still "a material factor." *United States v. Esparsen*, 930 F.2d 1461, 1472 (10th Cir. 1991). And, as noted, there was significantly more evidence of Garcia-Martinez's guilt than his mere presence.

Under these circumstances, the CIs' testimony—in particular, regarding Garcia-Martinez's role in the drug transaction—would not have been material to the jury's determination of Garcia-Martinez's guilt. Our survey of cases involving similar fact patterns allows us to conclude without hesitation that there is not a reasonable probability that our confidence in the soundness of the outcome would be undermined, even if suppressed impeachment evidence caused the jury in this case to disregard entirely the CIs' testimony—especially, the more incriminating testimony of CI Juan. *Cf. United States v. Williamson*, 53 F.3d 1500, 1515–16 (10th Cir. 1995) (holding that the evidence supported defendant's conviction of aiding and abetting distribution of cocaine, even though defendant claimed that she was merely present at the wrong place at the wrong time, where the jury could have considered that defendant "was present during a drug transaction taking place at night, that the transaction occurred within her line of sight and that she counted a sum of money totalling $2,800"); *United States v. Hooks*, 780 F.2d 1526, 1532 (10th Cir. 1986) (upholding defendant's conviction of possession with intent to distribute where the defendant was arrested while

32

driving a vehicle, not his own, containing a concealed bundle of twenty-two ounces of PCP valued at $10,000); *see also United States v. Armour*, 112 F. App'x 678, 681 (10th Cir. 2004) (unpublished) (finding sufficient evidence to support a jury's guilty verdict for possession with intent to distribute cocaine where (1) defendant was the only person found in the apartment where the cocaine was discovered and (2) his thumb print was discovered on the box containing the cocaine); *United States v. Delreal-Ordones*, 213 F.3d 1263, 1268 n.4 (10th Cir. 2000) ("[W]e have repeatedly stated that possession of a large quantity of narcotics is sufficient to establish the element of intent to distribute.").

Thus, there is a third independent ground for upholding the district court's *Brady* ruling. Specifically, even disregarding our conclusion—based on careful *in camera* review of the DEA's CI materials—that the government did not suppress material impeachment information, we would conclude that Garcia-Martinez cannot prevail on his *Brady* claim because there is no reasonable probability under these facts that, if Garcia-Martinez had been given access to any suppressed impeachment information with respect to the two CIs, the result of the proceeding would have been different.

\*\*\*

In sum, we conclude that Garcia-Martinez's *Brady* challenge must fail.

33

**B**

Garcia-Martinez next argues that the district court erred by permitting Agent Cronin to testify, as an expert, that Garcia-Martinez's activities in the underlying drug transactions did not resemble the agent's definition of an "unwitting" drug participant. *See* Aplt.'s Opening Br. at 26–27; *accord* Aplt.'s Reply Br. at 7–8. Garcia-Martinez claims that Agent Cronin's testimony ran afoul of Federal Rule of Evidence 704(b), by allegedly directing "the jury what to conclude from [the expert's] own investigation." Aplt.'s Opening Br. at 28.

Ordinarily, we review a district court's admission of expert testimony for an abuse of discretion; we will reverse only if the district court reached a "manifestly erroneous" decision. *United States v. Schneider*, 704 F.3d 1287, 1293 (10th Cir. 2013) (quoting *United States v. Dazey*, 403 F.3d 1147, 1171 (10th Cir. 2005)). But the government asserts that the standard of review is "difficult to ascertain" here because Garcia-Martinez contended at trial only that "the expert's answer invaded the jury's decision-making . . . by defining the offense's elements," but did not reference Rule 704's restrictions. Aplee.'s Resp. Br. at 15. Indeed, Garcia-Martinez forthrightly recognizes that "it is possible" that we might conclude that he forfeited his Rule 704 objection and that plain-error review is thus appropriate.[8] Aplt.'s Opening Br. at 25. However, he insists that "he

---

[8] To satisfy the stringent plain-error standard, a defendant must show
(continued...)

34

properly preserved the issue in the court below." *Id.* at 27. We need not—and thus do not—opine on this preservation question. That is because even under the abuse-of-discretion standard—which is comparatively more favorable to Garcia-Martinez—his Rule 704 challenge fails.

Opinion testimony is "not objectionable" simply "because it embraces an ultimate issue." FED. R. EVID. 704(a). Rule 704(b), however, carves out a limited exception to that general proposition, providing that, "[i]n a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone." FED. R. EVID. 704(b).

> As we have explained, "Rule 704(b) *only* prevents experts from expressly stating the final conclusion or inference as to a defendant's mental state. The rule does not prevent the expert from testifying to facts or opinions from which the jury could conclude or infer the defendant had the requisite mental state."

---

⁸(...continued)
"[1] an 'error' [2] that is 'plain' and [3] that 'affect[s] substantial rights.'" *United States v. Olano*, 507 U.S. 725, 732 (1993) (fourth alteration in original) (quoting FED. R. CRIM. P. 52(b)). If these requirements are satisfied, we may exercise our discretion to reverse if we determine that "[4] the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Id.* (second alteration in original) (quoting *United States v. Young*, 470 U.S. 1, 15 (1985)); *see also United States v. Story*, 635 F.3d 1241, 1244 (10th Cir. 2011) (setting forth the same framework).

35

*United States v. Goodman*, 633 F.3d 963, 970 (10th Cir. 2011) (emphasis added) (quoting *United States v. Richard*, 969 F.2d 849, 854–55 (10th Cir. 1992)); *see United States v. Orr*, 68 F.3d 1247, 1252 (10th Cir. 1995) (explaining that Rule 704(b) "prohibits an expert witness from testifying that a defendant did or did not possess the requisite mental intent at the time of the crime"). More specifically, "Rule 704(b) commands the expert to be silent" concerning "*the last step in the inferential process—a conclusion as to the defendant's actual mental state.*" *Goodman*, 633 F.3d at 970 (emphases added) (quoting *United States v. Dunn*, 846 F.2d 761, 762 (D.C. Cir. 1988)).

Agent Cronin's challenged testimony remained well within these parameters. Agent Cronin testified that, in his expert opinion, Garcia-Martinez's presence during the various phases of the drug transaction—e.g., the negotiation of the sale and the transportation of the drugs—combined with Garcia-Martinez's opening of the hood of the vehicle containing the drugs at the situs of the sale and the presence of his fingerprints on the drug packaging, suggested that Garcia-Martinez had a level of involvement in the transaction beyond that of "an unwitting person." *See* R., Vol. III, at 355–56, 361. To be sure, Agent Cronin's testimony, based upon the factual circumstances of this case, established a firm foundation for the jury to infer that Garcia-Martinez knew about the drug transaction and, indeed, was an active participant in it. But Agent Cronin's testimony stopped short of "necessarily dictat[ing] the final conclusion" that

36

Garcia-Martinez "possessed the requisite mens rea" for conspiracy to possess and possession with the intent to distribute heroin and methamphetamine. *United States v. Wood*, 207 F.3d 1222, 1236 (10th Cir. 2000).

Rather, Agent Cronin merely opined, in light of his experience and training, that the evidence in the case was not logically consistent with a finding that Garcia-Martinez was an unwitting participant. *See* R., Vol. III, at 357 (testifying that it was "not common and illogical for an unwitting to participate" in drug-trafficking negotiations and to be present at the point where the drugs are to be sold). Agent Cronin left it up to the jury to decide whether to actually reject the inference that Garcia-Martinez was an unwitting participant—*viz.*, to decide whether Garcia-Martinez possessed the requisite mental state for the charged offenses. *See Schneider*, 704 F.3d at 1294 (explaining that Rule 704(b) does "not prevent an expert from drawing conclusions about intent, so long as the expert does not profess to know a defendant's intent"); *Goodman*, 633 F.3d at 970 (explaining that testimony only violates Rule 704(b) when it "attempt[s] to bring forth expert opinion as to the very mental state at issue in the case—the defendant's mens rea when he committed the crime"). And the district court's instructions made clear to the jury that it was not constrained by Agent Cronin's expert testimony to reach a result favorable to the government on this question (i.e., to find that Garcia-Martinez was not an unwitting participant). In this regard, the court informed the jurors that they should give "each expert opinion

37

received in evidence . . . such weight, if any, as you may think it deserves." R., Vol. I, at 375.

In *Richard*, we rejected the defendants' Rule 704(b) challenge and upheld the district court's admission of analogous expert testimony. *See Richard*, 969 F.2d at 855. There, we reasoned

> [The expert] testified that based on his experience, a drug dealer will not invite others to participate in this type of transaction who are not aware of the nature of the transaction. Further, he offered his opinion that [the defendants] performed certain roles typically performed in similar drug transactions. While these remarks may have implied a belief that the [the defendants] were in fact aware of the nature of the transaction, [the expert] did not expressly draw that conclusion or inference for the jury. Hence, the testimony was not prohibited by Rule 704(b), and the district court did not err in admitting it.

*Id.* (footnote omitted).

This reasoning is fully in step with other decisions of our circuit. *See United States v. Gutierrez de Lopez*, 761 F.3d 1123, 1137 n.16 (10th Cir. 2014) (finding no Rule 704(b) violation, where the expert's opinion "left for the jury the ultimate inference on [the defendant's] intent"); *Orr*, 68 F.3d at 1252 ("Although the jury could have inferred defendant's criminal intent from [the expert's] statements, [the expert] did *not* testify that defendant had the requisite criminal intent for fraud. Admitting [the expert's] testimony was not error under Rule 704(b)."); *see also United States v. Becknell*, 601 F. App'x 709, 714 (10th Cir. 2015) (unpublished) (finding no abuse of discretion in the district court's

38

admission of expert testimony, where the expert "did everything *but* state th[e] final inference" that the defendant "possessed the gun in furtherance of drug trafficking" (emphasis added)). We should accordingly embrace that reasoning here. Consequently, we conclude that Rule 704(b) did not prohibit Agent Cronin's testimony, and the district court did not abuse its discretion in admitting his testimony.

### III

Based on the foregoing, we **AFFIRM** the district court's judgment.

Entered for the Court

JEROME A. HOLMES
Circuit Judge

No. 15-1432, <u>United States v. Edgar Leopoldo Garcia-Martinez</u>

**KELLY**, Circuit Judge, concurring.

I join parts I and II.B of the court's opinion. I also join the court's statement that the government was not obligated to disclose information that would impeach Roberto, ultimately a defense witness. Ct. Op. at 25. With that understanding, I join part II.A.1 of the court's opinion holding that the contentions on appeal are "based on sheer speculation and conjecture" and do not undermine the district court's resolution of the <u>Brady</u>/<u>Giglio</u> issue. Thus, an *in camera* review on appeal is not required, notwithstanding that both parties requested one. I would affirm on this basis.

No. 15-1432, *United States v. Garcia-Martinez*

**MORITZ**, Circuit Judge, concurring.

I agree with the majority that the district court didn't abuse its discretion in admitting Agent Cronin's expert testimony. *See* Maj. Op. 35–40. Likewise, I agree with the majority that Garcia-Martinez's *Brady* claim fails because he relies solely on conjecture and speculation in asking us to conduct an *in camera* review. *See* Maj. Op. 16–30. But because I would reject Garcia-Martinez's *Brady* claim on this basis, I see no reason to conduct our own *in camera* review to evaluate whether the government suppressed any favorable impeachment evidence. *See* Maj. Op. 26–30. Nor do I see any reason to determine whether—even assuming the government did suppress favorable impeachment information—that suppressed information was material. *See* Maj. Op. 30–35. Accordingly, I join all but Part II.A.2 and Part II.A.3 of the majority opinion.